NATIONAL PARKS AND CONSERVA-TION ASSOCIATION, Appellant,

v.

Thomas S. KLEPPE, Secretary, U. S. Department of the Interior, et al.

No. 76–1044.

United States Court of Appeals, District of Columbia Circuit.

Argued May 24, 1976.

Decided Nov. 15, 1976.

Victor H. Kramer, Washington, D. C., with whom Richard B. Wolf, Washington, D. C., was on the brief for appellant.

Michael F. Hertz, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty. and William Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief for Federal appellees.

W. Stanfield Johnson, Washington, D. C., with whom A. Tupper Brown, Washington, D. C., was on the brief for appellee, Conference of National Park Concessioners.

Before TAMM and MacKINNON, Circuit Judges, and KAUFMAN,* United States District Judge for the District of Maryland.

Opinion for the Court filed by Circuit Judge TAMM.

TAMM, Circuit Judge.

This appeal arises out of a suit under the Freedom of Information Act, 5 U.S.C. § 552 (1975 Supp.) (FOIA) brought by appellant National Parks and Conservation Association[1] to enjoin various governmental defendants from withholding financial records filed by certain national park concessioners with the National Park Service (NPS).[2] The district court initially granted the government's motion for summary judgment, holding that the information requested fell within the Act's fourth exemption.[3] *National Parks and Conservation Associa-* tion v. Morton, 351 F.Supp. 404 (D.D.C. 1972). On appeal, this court reversed that decision and remanded for further proceedings to determine whether public disclosure of the information in question would be likely to cause substantial harm to the competitive positions of the parties from whom it had been obtained. *National Parks and Conservation Association v. Morton*, 162 U.S.App.D.C. 223, 498 F.2d 765 (1974) (*National Parks I*). The Conference of National Park Concessioners (Conference)[4] was joined as an intervenor-defendant on remand, and two days of further evidentiary hearings were held on the competitive injury issue. The district court, applying the standard elucidated in *National Parks I*, held that with certain exceptions disclosure of the information was still not required. The Association once again appealed to this court, but after carefully examining the record, the briefs and the district court's memorandum, we find reversible error in the district court's decision only as to two of the concessioners and therefore affirm its judgment with respect to the rest.

## I. FACTUAL BACKGROUND

The National Park System, which began in 1872, has grown into an extensive network of recreational preserves enjoyed by millions of tourists every year.[5] Private concessioners licensed by the National Park Service to operate within the parks provide innumerable goods and services including

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. The Association describes itself as a "non-profit educational and scientific organization devoted to the preservation of the environment and to the protection of the national parks and monuments of the United States." J.A. 8.

2. The Service is a bureau within the United States Department of the Interior, one of the appellees on this appeal. It has extensive regulatory authority over all facets of national park operations and is charged with implementing the congressional policy of preserving park values for the enjoyment of future generations. 16 U.S.C. § 20 (1970). Among its various functions, the Service licenses the concessioners operating within the park system. 16 U.S.C. §§ 1, 2, 20a (1970).

3. The fourth exemption provides that the disclosure provisions of the Act do not apply to:

 trade secrets and commercial or financial information obtained from a person and privileged or confidential . . . .

 5 U.S.C. § 552(b)(4)(1970).

4. The appellee Conference represents 43 separate businesses operating concessions in national parks under license from the Service. Many of the largest park concessioners are members.

5. The Service administered 286 park areas by the end of 1975, with visits to them estimated at approximately 240 million visitor-days per year, or a twofold increase within the past decade. *See* H.R.Rep. No. 94–869, 94th Cong., 2d Sess. 4 (1976).

food, lodging, gasoline and souvenirs.[6] Concession activity in the national parks is a thriving business which is becoming increasingly dominated by large corporate concessioners.[7]

The relationship between the Park Service and the park concessioners is long-standing and has been fostered in large measure by various financial incentives aimed at maintaining the quality and continuity of goods and services available to park visitors. *See generally* S.Rep. No. 765, 89th Cong., 1st Sess. 2 (1965), U.S.Code Cong. & Admin.News 1965, p. 3489. The Secretary of the Interior is authorized to permit only one concessioner to operate within any particular park, or to grant a monopoly in the supply of particular goods or services within a park. 16 U.S.C. § 20c (1970). The Secretary also may grant an existing concessioner a preferential right to provide any new or additional services, *id.*, § 20c, and, most importantly, may renew a concessioner's contract if he determines that it has performed its prior obligations satisfactorily. *Id.* § 20d. Moreover, a concessioner is given a possessory interest in any structure, fixture or improvement it constructs on land administered by the Park Service, *id.* § 20e, and every concessioner benefits from the Secretary's statutory mandate to exercise his authority in such a manner as to ensure that all concessioners have a reasonable opportunity to profit from their investment. *Id.* § 20b(b).

This arrangement, on which the government has always heavily depended to provide park visitors with necessary facilities and services, does impose certain controls on concessioners. The Secretary is required to examine periodically the reasonableness of the prices charged by each concessioner and the franchise fee it pays to the government, considering the prices charged by comparable businesses and the value of the concession privileges. *Id.* §§ 20b(c)–(d). Concessioners are required to assist in this examination by submitting detailed financial information to the Service on a continuing basis. *Id.* § 20g. It is this information, contained for the most part in four separate reports, that appellant seeks to acquire.

Whenever a concessioner enters a licensing agreement with the Service, it must submit a "Concessioner Opening Balance Sheet,"[8] revealing its assets, liabilities, net worth and additional supporting information detailed in eight separate schedules.[9] Every year each National Park concessioner must file a "Concessioner Annual Financial Report,"[10] exacting similar balance sheet information and an exhaustive cataloguing of operating data[11] which provides a com-

6. By the end of 1974, 348 concessioners were operating at 87 areas within the National Park System, a substantial increase from 246 concessioners in 1970. *Id.*

7. In 1974 all 348 concessioners grossed more than $130.3 million and netted more than $7.6 million, yet just 56 of these concessioners together grossed more than $110.8 million and netted almost $6.5 million. *Id.* Moreover, while the number of concessioners with gross receipts in excess of $500,000 increased only by a third from 1970 to 1974, the net income of this group more than doubled. *Id.*, Appendix 2, at 85.

8. NPS Form No. 10–356c (May 1971); J.A. 140–53.

9. The supporting schedules of the Concessioner Opening Balance Sheet call for discrete information as to each concessioner's cash in banks and on hand, marketable securities and investments, notes and accounts receivable, prepaid expenses, fixed assets and accumulated depre-

ciation (including location, date acquired, useful life, cost, accumulated depreciation and book value for every concessioner-owned and government-owned structure), notes and accounts payable, mortgages and long-term liabilities, accrued liabilities, and the names of all partners or major stockholders, together with their percentage of ownership or shareholdings. See *id.*

10. NPS Form No. 10–356 (Rev. Apr. 1968); J.A. 127–35.

11. Schedule A of the Annual Report, for instance, contains 28 line items for operating and other income, deductions, taxes on income and special items. The remaining supporting schedules request a listing of, for example: twelve different taxes paid (Schedule C); other general expenses individually listed (Schedule D); statement of net worth as attributed to capital and retained earnings (Schedule F); a breakdown of gross profits derived from each type of operation (Schedule H); and salaries of

plete picture of a concessioner's operating condition. A third form, the "Annual Report of Capital Improvements to Concessions Facilities",[12] calls for a detailed yearly description of all projects existing or planned for the following year, by location, cost and occupancy capacity. The Park Service requires still another form, the "Annual Report of Statistical Information Concession Facilities",[13] describing every type of concession facility, by location, number of rooms and baths, percentage of room occupancy during peak months, trailer site capacity and additional similar information.[14] Finally, the Service also compiles reports from periodic audits of concession operations which contain similar though even more detailed financial information. *See* J.A. 211–12.

In September 1971 the National Parks and Conservation Association undertook to study the Service's concessions management program to determine whether existing concession arrangements were consistent with the public interest and congressional objectives. *See* J.A. 8. In order to prosecute this study, the Association requested a substantial number of documents from the NPS, see J.A. 11–14, which had been submitted by eight different national park concessioners.[15] Many of the documents were made available, but not the financial reports described above and certain other financial information contained in correspon-

dence from the concessioners. See J.A. 15–17. The Association then filed suit in the United States District Court for the District of Columbia.

## II. LEGAL BACKGROUND

■ The sole issue before the district court was whether the information sought by the Association was "confidential" within the meaning of the fourth exemption, since the parties conceded that it was financial, obtained from a person and not subject to a privilege. 351 F.Supp. at 406 (1972). The court decided that the financial information was exempted because it was of a kind "that would not generally be made available for public perusal." *Id.* at 407. The Association appealed to this court and, although we agreed that whether information would customarily be disclosed to the public by the person from whom it is obtained is a relevant inquiry, we held that it was not the only relevant inquiry in deciding whether information is confidential for fourth exemption purposes. *National Parks I, supra,* 498 F.2d at 767. We examined the legislative history and determined that for purposes of exemption for commercial or financial information is confidential if its disclosure is likely: "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competi-

owners, partners and officers and remunerations to directors, individually listed (Schedule K). See *id.*

**12.** NPS Form No. 10–356a (Rev. Dec. 1963); J.A. 136.

**13.** NPS Form No. 10–356b (Rev. Dec. 1963); J.A. 138.

**14.** The district court, on remand, ordered that the information contained in this report be turned over to the Association with the exception of the occupancy percentages. Thus, as to this particular report, only the excepted information is still at issue.

**15.** Appellant seeks financial information from the following eight concessioners:

The Cavern Supply Co., Inc. (Carlsbad Caverns)

General Host Corp. (Yellowstone)
National Park Concessions, Inc. (Mammoth Cave, etc.)
Mountain Company, Inc. (Mount Rushmore)
Yosemite Park & Curry Co. (Yosemite)
Fred Harvey, Inc. (Grand Canyon)
Buzzard Point Boatyard Corp. (National Capital Parks)
Prince William Trailer Park, Inc. (park not identified in record)

Only the last three concessioners do not belong to the Conference.

Subsequent to the Association's request, Prince William Trailer Park, Inc. responded that it had no strong objection to the disclosure of its financial reports, and the agency consequently released them. J.A. 44, 284. This particular concessioner's competitive position is, thus, no longer in issue.

tive position of the person from whom the information was obtained."[16] *Id.* at 770.

On remand the district court was directed to hold further proceedings only on the competitive injury issue, since it was evident that the government's ability to obtain information in the future would not be impaired by disclosure where the information in this instance was required by statute of all NPS-licensed concessioners.[17] The district court conducted two additional hearings and held that, with respect to most of the information, appellees had sustained their burden of proving that disclosure would be likely to cause the concessioners substantial competitive harm.[18] The court rejected the Association's argument that the concessioners were statutory monopolists without meaningful competitors and found that the concessioners did face meaningful competition for both the tourist dollar and the renewal of their concession contracts. J.A. 287–88. Still not all of the information requested was exempted from required disclosure. Recognizing that the Act as a whole seeks to balance the policies of public disclosure and protection of private rights, *id.* at 293, *citing Environmental Protection Agency v. Mink*, 410 U.S. 73, 80, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), the court held that at least some of the information requested does not fall within the fourth exemption under *National Parks I* and consequently must be disclosed.[19]

The Association now argues that the district court's conclusion regarding the likelihood of substantial competitive harm was erroneous. It further challenges two other justifications for nondisclosure given by the district court as incorrectly holding that the fourth exemption protects individual privacy as well as competitive position and as misperceiving the applicability of the general "housekeeping" provision, 18 U.S.C. § 1905 (1970), to this case. With a fuller record now before us and benefiting from a continuing judicial interpretation of "fourth exemption law," we turn now to examine these contentions.

**16.** In *National Parks I* we expressly left open the issue of whether or not other governmental interests might be embodied in section 552(b)(4). *Id.* at 769, n. 17. *Cf. Statement by the President Upon Signing Bill Revising Public Information Provisions of the APA (July 4, 1966)*, 27 Weekly Compilation of Presidential Documents 895 (1966) ("[T]his bill in no way impairs the President's power under our Constitution to provide for confidentiality when the national interest so requires.").

With respect to the second element of this test, if a party claiming the exemption has customarily disclosed similar information to the public, it may be hard pressed to justify a subsequent claim of confidentiality. Financial data, however, does change and not always in the direction management might wish; we do not believe therefore that the party seeking to sustain nondisclosure should have the additional burden of specifically proving that the information was not customarily disclosed to the public. The inquiry is a relevant one, we agree, but only insofar as it informs the court as to the likelihood of substantial competitive injury under the *National Parks I* test. *But cf. Pacific Architects & Engineers, Inc. v. Renegotiation Board*, 164 U.S.App.D.C. 276, 505 F.2d 383, 384 (1974).

**17.** Appellant forcefully contended that no showing of likely competitive injury could possibly be made by the appellees anyway, quite simply because the concessioners face no competition either in their day-to-day business operations or in the renewal of their contracts. Although we found their argument "very compelling", we gave the agency an opportunity on remand to develop a fuller record on this issue. 498 F.2d at 770.

**18.** The district court concluded that disclosure of the information by the Park Service

would be useful to a competitor in devising means to improve its competitive position at the expense of the concessioner. Such disclosure would reveal concessioners' business secrets . . . without providing the concessioner in most instances with similar access to the books and records of his competitors. This competitive disadvantage is fundamentally unfair and would be likely to cause harm to the concessioner's basic position.

J.A. 295–96.

**19.** *See* 5 U.S.C. § 552(b) (1975 Supp.). The information ordered released consisted of the Annual Financial Report's Schedule B (except for supporting details), Schedule M and the Attachment Form 10–356(b) (except for occupancy percentages). J.A. 296.

## III. RESOLUTION OF THE ISSUES

The principal issue on remand was whether disclosure of the requested documents would cause substantial competitive harm to the several named concessioners. As appellant correctly notes, resolution of this issue in favor of the concessioners requires them to prove [20] that: (1) they actually face competition, and (2) substantial competitive injury would likely result from disclosure. Failure to make the necessary showing on either point would require a court to compel disclosure under the *National Parks I* test. The Association contends that the district court's findings in favor of appellees on both points were not supported by substantial evidence. Appellant's Brief at 18. We cannot set aside either of these findings, however, unless, after giving due regard to the trial court's opportunity to judge the credibility of each witness, we are forced to conclude that it was clearly erroneous. Fed.R.Civ.P. 52(a).

The district court specifically found that these concessioners face competition. After further documentary evidence had been introduced, witnesses examined and cross-examined and various memoranda considered, it concluded:

> The preponderance of the evidence indicates . . . that there is competition respecting the renewal of concession agreements as well as competition for the tourist dollar. There is competition between concessioners within parks, and there is competition between concessioners and businesses located nearby the parks, by which visitors must pass on the way to the parks. In addition, there is competition within the parks between the concessioners and businesses operating on privately owned land within the parks.

J.A. 287–88. The Association argues that, under *Pacific Architects and Engineers, Inc.* *v. The Renegotiation Board*, 164 U.S.App. D.C. 276, 505 F.2d 383, 385 (1974), which requires "specific factual or evidentiary material" to sustain the burden of proof under exemption four, the "mere conclusory opinion testimony" of the Conference's Chairman was wholly insufficient. We agree that *Pacific Architects* applies to the nature of proof required here, but we cannot agree that the district court failed to apply its precepts properly.

According to the Association only a detailed economic analysis of the competitive environment will satisfy *Pacific Architects'* proof requirement, at least where exceptional businesses such as the park concessioners are involved. Appellant's Reply Brief at 4–5. It offers several analogous "legal frameworks" by which, in its opinion, the Conference and the Park Service could have satisfactorily proven the facts essential to their defense, assuming that they existed at all. For example, the Association suggests that

> the burden of establishing the existence of competition under exemption 4 can draw effective reference from the Government's burden under § 7 of the Clayton Act . . . to show the existence of meaningful competition by establishing in which geographic area and for what products or services competition may be lessened by the proposed merger.[21]

Appellant's Brief at 20–21. It further suggests that were these concessioners actually engaged in competition, the appellees could have proven this by introducing: surveys of each concessioner's customers, demonstrating the extent of cross-elasticity of demand between the goods and services provided by it and those provided by non-concessioners; detailed comparative descriptions of the nature, quality and price of each item offered

---

**20.** The party seeking to avoid disclosure bears the burden of proving that the circumstances justify nondisclosure. *See* 5 U.S.C. § 552(a)(3) (1975 Supp.). *See, e. g., Vaughn v. Rosen,* 173 U.S.App.D.C. 187, 523 F.2d 1136, 1144 (1975). In *National Parks I* we did not discuss the precise manner in which the defendant was to go about meeting its burden.

**21.** We refrain from speculating whether detailed economic evidence of the kinds suggested by appellant might be necessary in other fourth exemption cases. *See* Government's Brief at 19; Appellant's Reply Brief at 2–3. We only decide that it was not required here.

by the concessioners and their alleged competitors; pricing and rate-of-return statistics; marketing practice surveys; and advertising expenditure records. *Id.* at 21–23. Such evidence would be relevant and material under the second prong of the *National Parks I* test for the fourth exemption, but it is not required, and in this case other sufficient evidence, meeting the standards of *Pacific Architects,* was adduced to support the district court's conclusion of law.

*Pacific Architects* represents a synthesis of two prior decisions of this circuit, *Vaughn v. Rosen,* 157 U.S.App.D.C. 340, 484 F.2d 820 (1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), and *Cuneo v. Schlesinger,* 157 U.S.App.D.C. 368, 484 F.2d 1086 (1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), both of which proposed specific procedures to prevent an agency, or any other party resisting disclosure, from "thwarting the intent of the Freedom of Information Act by making 'conclusory and generalized allegations of exemptions . . .' " *Pacific Architects, supra,* 505 F.2d at 384, *citing Vaughn, supra,* 484 F.2d at 826 and *Cuneo, supra,* 484 F.2d at 1092. In *Vaughn,*[22] the trial court granted the government's motion for summary judgment solely on the basis of an agency official's affidavit that "did not illuminate or reveal the contents of the information sought, but rather set forth in conclusory terms the [agency's] opinion that the [information was] not subject to disclosure under the FOIA." 484 F.2d at 823. There was little else in the record to permit meaningful appellate review of the district court's decision: no evidentiary hearing was held, no witnesses were examined and no other evidence was introduced to establish a factual basis for exempting the requested information. *Id.* In *Cuneo,*[23] the trial court granted the government's

summary judgment motion, after an *in camera* inspection of the document at issue. The government opposed disclosure only on the basis of conclusory and generalized allegations that various exemptions applied, so that the party seeking disclosure was "helpless to contradict the Government's description of the information . . . ", 484 F.2d at 1092, or to assert its rights effectively. The same procedural flaws infected the lower court's adjudication in *Pacific Architects.* Its decision also was based merely on an *in camera* inspection, unenlightened by any specific agency statement as to the factual and legal justification for its claimed exemption. 505 F.2d at 385.

■ It is within the context of these particular procedural infirmities, then, that the court must judge the proof requirements established by these cases, and by *Pacific Architects* in particular. Conclusory and generalized allegations are indeed unacceptable as a means of sustaining the burden of nondisclosure under the FOIA, since such allegations necessarily elude the beneficial scrutiny of adversary proceedings, prevent adequate appellate review and generally frustrate the fair assertion of rights under the Act. *See Pacific Architects, supra,* 505 F.2d at 384–85; *Cuneo, supra,* 484 F.2d at 1092; *Vaughn, supra,* 484 F.2d at 823–26.

The record on this appeal, however, exhibits none of these problems. The specific exemption claimed is known to all. The government has adequately specified the information being withheld. The Association had an opportunity during two days of hearings to present fully its own case and to dispute the evidence offered by the appellees. No *in camera* inspection took place, and an extensive record is now before

22. The trial court in *Vaughn* had granted the government's motion for summary judgment without explanation. It is not clear therefore exactly which exemption was deemed dispositive, *see* 484 F.2d at 823, though the fourth certainly was not. Nevertheless, the rationale and procedural precepts of the *Vaughn* court's opinion reversing the district court indisputably apply to them all.

23. In *Cuneo* the district court held that portions of the Defense Contract Audit Manual were exempt under exemptions 2 and 5. 484 F.2d at 1088. Like *Vaughn,* however, its holding and underlying rationale are equally applicable to claims under any of the exemptions.

this court. We are unable to accept the Association's contention that *Pacific Architects* and its precursors necessarily in all or even in most cases also require the kinds of evidence more usually associated with elaborate antitrust proceedings, nor are we convinced of the feasibility and wisdom of imposing such a requirement in fourth exemption cases generally.[24]

The Association also challenges the district court's findings that disclosure would cause the concessioners substantial competitive harm not only in their day-to-day business operations, but also at the time for renewal of their contracts. J.A. 292. Although we are compelled to agree with the Association that substantial injury to any of the concessioners is quite unlikely in their "competition" for contract renewal, we cannot say, after reviewing the record in its entirety, that the district court erred in finding that at least five of the concessioners do face meaningful day-to-day competition with businesses offering similar goods and services both within and outside the national parks.

Renewal tends to be automatic.[25] Not only does an existing concessioner enjoy a statutory renewal preference if the Park Service determines that its past performance has been satisfactory, 16 U.S.C. § 20d, which the agency invariably does, but also renewal competition occurs only infrequently,[26] as the government concedes,[27] because most of the larger concessioners have very long contracts.[28] Moreover, since enactment of the Concession Policies Act of 1965,[29] concessioners have been granted a possessory interest in any structure or improvement made by them on government land.[30] If its contract is not renewed, a concessioner may demand compensation for such capital improvements on the basis of "reconstruction costs less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind, but not to exceed fair market value." 16 U.S.C. § 20f (1970). This compensable possessory interest, where it has been incorporated into a current concession contract,[31] poses a considerable, even insuperable, barrier to competition at the con-

---

24. For instance, the costs of obtaining such detailed economic evidence as appellant suggests should have been required of these concessioners might well preclude a small business from ever seeking to prevent disclosure of its confidential commercial or financial information. *See generally* 5 U.S.C. § 552(a)(4)(E) (1975 Supp.). Furthermore, a standard of proof that would render FOIA proceedings any more complex and time consuming would unnecessarily hinder the fair and expeditious administration or adjudication of FOIA requests.

25. Though certainly not conclusive, it is interesting to note, as appellant emphasizes, that apparently no concessioner desiring to renew its contract has ever failed to do so. Government's Brief at 26; Appellant's Brief at 25.

26. *See* Comptroller General, Concession Operations in The National Parks—Improvements Needed in Administration 16 (1975) [hereinafter Report]; J.A. 303. The Report indicates that 11 existing contracts were renewed during calendar year 1974, and in no case was there any response by other parties to the public notice or fact sheets issued by the Park Service. *Id.*

27. Government's Brief at 26. The government seeks to justify these long contract periods as being "necessary to protect the concessioners'

large capital investment that must be made on property that is not even owned by them and because of the generally short operating season." *Id.* See also Conference's Brief at 27–28. While this explanation may be correct, it is not relevant.

28. Three of the named concessioners have 30-year contracts with the Park Service, expiring in 1998 (Fred Harvey, Inc.), 1996 (General Host, Inc.) and 1993 (Yosemite Park & Curry Co.). Three others have 20-year contracts, expiring in 1991 (Mountain Co.), 1989 (Cavern Supply Co.) and 1981 (National Park Concessions, Inc.). The last, Buzzard Point Boatyard Corp., has a 5-year contract expiring in 1977.

29. 16 U.S.C. §§ 20–20g (1970).

30. *See id.* § 20e.

31. Given the contract periods listed at footnote 28, *supra,* we assume that at least five of the seven named concessioners have contracts incorporating the possessory interest provision. Moreover, even where the current contract does not recognize a possessory interest, the Secretary may still determine that equity warrants recognition of it anyway. 16 U.S.C. § 20e (1970).

682

tract renewal stage, since it usually requires that either the Park Service or another private business seeking to outbid the existing concessioner must be willing to acquire the interest at a "reconstruction cost" greatly in excess of book value.[32]

■ In light of the practical barriers to competition by potential contract bidders and the infrequency with which renewals occur, we are forced to conclude that the district court's finding that disclosure of the financial information would "materially increase the opportunity for potentially damaging competition for renewal of concessions," J.A. 288, is clearly erroneous. Although the statutory "preference" is not absolute,[33] the appellees' sole witness testified that renewal competition was "far less significant" than day-to-day competition, J.A. 170, and could not remember one specific instance in his 40 years experience with the national parks where an existing concessioner was denied renewal of its contract. *Id.*

■ We nevertheless affirm the trial court's holding of nondisclosure with respect to five of the seven concessioners in question, since there is sufficient evidentiary basis to support its conclusion, which we are aware contains several minor errors, that disclosure would cause substantial competitive injury to them from surrounding businesses. J.A. 285–89. Much of the evidence introduced by both sides on this issue focused on the location of the park concessioners relative to other similar businesses within and outside the parks. The parties do not seriously dispute the relevant

topographies, but they do disagree over the inferences to be drawn from them.

The district court credited appellees' witness with extensive knowledge and experience in park concessions, but considered the qualifications of the Association's sole witness to be "considerably more limited." J.A. 283. This judgment must be weighed by an appellate court reviewing the trial court's findings. Fed.R.Civ.P. 52(a). The testimony of appellees' witness, and the exhibits he presented, established that while the concessioner has a competitive advantage in being located within the park—the tourist's presumed destination—the approaches to it are almost invariably cluttered with scores of businesses offering the same types of goods and services as the park concessioners. J.A. 174–75. We do not consider it implausible that these surrounding businesses, whose prices are not regulated by the NPS, enjoy some competitive advantage, too, by virtue of their having first and last "crack" at the tourists on their way into and out of the park. *See* J.A. 175. The evidence also supports the findings that certain of the concessioners compete with others within the same park, or with non-concessionary businesses located on private land within the park.[34]

For example, the district court specifically[35] found that General Host Corp., which operates a concession in Yellowstone National Park, competes with another concessioner within that same park which provides comparable services though on a more limited scale.[36] J.A. 285. In addition, several towns on the perimeter of the park contain numerous businesses providing the

32. *See* Report at 17; J.A. 304.

33. S.Rep.No.765, 89th Cong., 1st Sess. 5 (1965), U.S.Code Cong. & Admin.News 1965, p. 3489.

34. In *National Parks I* we suggested that on remand appellees perhaps could prove that disclosure would cause competitive harm to a concessioner's non-concession businesses. 498 F.2d at 770–771. Neither, however, made any attempt to show such harm.

35. The Association insists throughout its brief that the appellees had to introduce specific evidence as to the prices, quality and nature of the services provided by the surrounding non-

concessioners. *E.g.,* Appellant's Brief at 38. We have decided, however, that compliance with the *Pacific Architects* standard does not necessarily require introduction of such detailed "economic" evidence. See text accompanying footnotes 23–24, *supra.*

36. The district court also found that this second principal concessioner operated hotels in Yellowstone National Park. This was error, see J.A. 172, but not so egregious that it affects the court's general finding that General Host Corp. did face competition.

usual sorts of tourist-oriented services.[37] One such town, West Yellowstone, Montana, boasts 47 motels, 9 gas stations and 12 restaurants. J.A. 102. One advertisement for West Yellowstone, in fact, publicizes 10,000 beds. J.A. 183. Likewise, the Cavern Supply Co. operates the only concession at Carlsbad National Park, New Mexico, with a restaurant, subterranean lunchroom, and a large souvenir and gift shop operation. *Id.* Seven miles away, however, the town of White's City sports various motels, tourist shops and restaurants, many of which are prominently featured in a brochure produced by "White's City, Inc." which clearly indicates that these businesses are directing their advertising toward park visitors. J.A. 107–08. Further, Fred Harvey, Inc., another of the seven concessioners, operates lodging, food, transportation and souvenir facilities on the south rim of the Grand Canyon National Park. Two other concessioners also operate in close proximity, offering food and souvenir services. J.A. 190–92. Within eight miles of this concessioner's park operations, a small community features several hundred beds, 1,000 seats for food service and assorted curio shops. J.A. 191.

■ Without belaboring the point further, we are satisfied on the basis of other comparable record evidence that, on balance, similar findings made by the district court with respect to the competitive postures of Yosemite Park & Curry Co. and Mountain Company, Inc. were not clearly erroneous. The district court made no specific factual finding, however, concerning the competitive position of either National Park Concessions, Inc. or Buzzard Point Boatyard Corp. In sustaining nondisclosure of their financial records, the court apparently relied on presumed contract competition at renewal time and on testimony by appellees' witness that, although he had no personal knowledge of either concession, he

had no reason to believe that they face a competitive situation any different from other national park areas. J.A. 175, 194; *see id.* 287. Such conjecture, standing alone as it must in view of our determination that contract renewal competition is insignificant, is insufficient to sustain the district court's holding as to these two concessioners which must thus be reversed. We would have to ignore *Pacific Architects* to conclude otherwise.

■ With the exception of these two concessioners, appellees have also met their burden of proving that disclosure would be likely to cause substantial competitive harm. The district court found that it would, J.A. 289, 292, 295–96, and substantial evidence in the record supports the necessary inferences leading to that conclusion. No actual adverse effect on competition need be shown, nor could it be, for the requested documents have not been released. The court need only exercise its judgment in view of the nature of the material sought and the competitive circumstances in which the concessioners do business, relying at least in part on relevant and credible opinion testimony.

The Association challenges the district court's finding of probable competitive injury on two grounds. First, it points out that the district court found "merit" in the Conference's objection that the concessioners' competitive postures would be impaired if salary information were made available. J.A. 282. However, appellant correctly argues, since the requested financial reports only itemize salaries for "owners, partners, and/or officers, and remuneration to directors",[38] there is no merit to the court's concern that disclosure might result in the hiring away of a "chef or a knowledgeable handyman." *See* J.A. 282; Appellant's Brief at 42. Nor is it likely that a partner or owner would consent to work for his competitor. Still, the salaries of officers

---

**37.** While West Yellowstone, Gardiner and Cooke City, Montana, are all located immediately outside the park, Cody, Grand Teton National Park with its concessioner, and Jackson, Wyoming, are located at a considerable distance from the park, as appellant emphasizes. Appellant's Brief at 37–38.

**38.** Concessioner Annual Financial Report (Schedule K); J.A. 131.

are itemized, and officers need not also be partners or owners, so that all possibility of personnel raiding actually cannot be discounted.

Second, the Association argues that even if disclosure might conceivably cause some loss of business, it could not possibly cause *substantial* harm because the Secretary is directed by statute to ensure concessioners a reasonable opportunity for profit, 16 U.S.C. § 20b(b) (1970), and is authorized to adjust the franchise fee, *id.* § 20b(d), and prices charged the public, *id.* § 20b(c). Appellant's Brief at 41. We do not find this argument particularly compelling. Subsection 20b(b) does not guarantee a profit; in fact, many park concessioners apparently lose money.[39] Rather it only directs the Secretary to exercise his authority over concession activities in a manner consistent with a *reasonable opportunity* to realize a profit." *Id.* § 20b(c) (emphasis added). The legislative history of this particular provision further establishes that "[r]easonableness is to be judged by the operation as a whole so that necessary but unprofitable services may be balanced off by those that are profitable." S.Rep.No.765, 89th Cong., 1st Sess. 5 (1965), U.S.Code Cong. & Admin. News 1965, p. 3493. Nor can downward adjustments of the franchise fee immunize a concessioner from substantial competitive harm. While the franchise fee is determined upon consideration of "the opportunity for net profit in relation to both gross receipts and capital invested," 16 U.S.C. § 20b(d) (1970), adjustments are considered only periodically[40] and when finally made can only mitigate the extent of prospective decline in earnings. Finally, subsection 20b(c) does not specifically mention "profitability" among the several factors by which

the reasonableness of a concessioner's prices is to be judged;[41] the concessioners are not public utilities whose rates are determined on a return-on-investment or cost-of-capital basis. In any event, relief by way of this provision also would only be prospective.

Viewing the district court's findings that these five concessioners face competition in light of the extremely detailed and comprehensive nature of the financial records requested by the Association, we consider the likelihood of substantial harm to their competitive positions to be virtually axiomatic. Disclosure would provide competitors with valuable insights into the operational strengths and weaknesses of a concessioner, while the non-concessioners could continue in the customary manner of "playing their cards close to their chest." Selective pricing, market concentration, expansion plans and possible take-over bids would be facilitated by knowledge of the financial information the Association seeks. Suppliers, contractors, labor unions and creditors, too, could use such information to bargain for higher prices, wages or interest rates, while the concessioner's unregulated competitors would not be similarly exposed. Appellees' experienced witness described each schedule of the Concessioner Annual Report and explained how competitors could use this information to the detriment of the concessioners. J.A. 195–212. In sum, viewing the evidence in the record, we are persuaded that the district court's findings in this regard are sufficiently well-founded and certainly not "clearly erroneous."

█ The district court went beyond the scope of our remand in *National Parks I* and, relying on this court's subsequent decision in *Rural Housing Alliance v. Department of Agriculture*, 162 U.S.App.D.C. 122,

---

**39.** In 1972, for instance, 52 of 336 concessioners failed to make a profit. Government's Brief at 25 n.14.

**40.** Subsection 20b(d) provides for reconsideration of franchise fees "at least every five years unless the contract is for a lesser period of time." 16 U.S.C. § 20b(d) (1970).

**41.** This provision does state that "other factors deemed significant by the Secretary . . ."

may be considered. *Id.* § 20b(c). Still, as the legislative history indicates, the "prime consideration in this connection is comparison with similar operations outside the national park areas . . .", S.Rep.No.765, 89th Cong., 1st Sess. 5 (1965), U.S.Code Cong. & Admin.News 1965, p. 3493, and not the profit and loss statement of the concessioner.

498 F.2d 73 (1974), held that nondisclosure also was warranted in the case of small or individually owned concessions where the "information sought is of a highly personalized and private nature." J.A. 294, 296. In its judgment, this independent basis for nondisclosure applied especially to three of the concessioners.[42]

We do not believe that the particular circumstances of this appeal are appropriate for an extended discussion, much less judicial resolution, of the rather complicated issues posed by this holding. First, there is nothing in the record to show that any of the concessioner's financial records were really "personalized," which we take to mean that ownership is so limited that a business' finances can be attributed divisibly and accurately to individual stockholders or partners. Second, the district court gave no explanation for its holding beyond the reference to *Rural Housing* and did not even specify which exemption it found justified protection of such information. The parties consequently have not chosen to brief this issue in any depth. Only one of the concessioners, Buzzard Point Boatyard Corp., would be affected directly by our decision, and it may be found on remand to have fulfilled the *National Parks I* test anyway.

Assuming *arguendo* that some of these concessioners were individually-owned businesses so that their financial records would necessarily reveal at least a portion of the owner's personal finances, it is still unclear that such "personalized" financial information would be exempted. Although the district court failed to indicate which exemption it had in mind, appellees assume that it was the fourth. They maintain that the fourth exemption embodies a strong personal privacy interest that provides a basis for nondisclosure distinct from those specified in the *National Parks I* test. *See* Government's Brief at 31–32; Conference's Brief at 39–41.

*National Parks I* did not recognize personal privacy rights as a relevant concern under the fourth exemption. Although there are ambiguities in the legislative history of the fourth exemption,[43] we believe that the *National Parks I* test accurately reflects the two predominant concerns ventillated throughout the hearings and is consistent with our general policy of narrowly construing the Act's exemptions. *See, e. g., Bristol-Myers Co. v. FTC*, 138 U.S.App.D.C. 22, 424 F.2d 935, 938, *cert. denied*, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970). Furthermore, the FOIA already explicitly recognizes a personal privacy interest in exemption six, which protects from required disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (1970). Personal or "personalized" financial information[44] may well qualify under the "similar files" rubric of exemption six, at least insofar as it contains "embarrassing disclosures" or involves "sufficiently intimate details." *See Rural Housing, supra,* at 75–76 n.4, 77. To determine that exemption four rather than six applies to "personalized" financial information, we would also have to justify an easier burden of proof for exemption of "personal" financial information than of other far more intimate information, because exemption six only protects against *"clearly unwarranted inva-*

---

**42.** The district court found that this basis for nondisclosure applied particularly to Mountain Co., Cavern Supply Co., and Buzzard Point Boatyard Corp. J.A. 296. Only Buzzard Point Boatyard will be involved in the remand from this second appeal.

**43.** The Conference attempts to bolster its argument on the privacy question with one such ambiguity. *See* Conference's Brief at 40, where it labels the Judiciary Committee's explanation for substituting the phrase "obtained from a person" for "obtained from the public", S.Rep.No.813, 89th Cong., 1st Sess. 2 (1965), as a clear indication that Congress sought to protect private financial information as well as competitive position when it enacted the fourth exemption. *But see* K. Davis, Administrative Law Treatise § 3A.19, at 163 (1970 Supp.).

**44.** The sixth exemption has not been extended to protect the privacy interests of businesses or corporations. *See Washington Research Project, Inc. v. HEW*, 366 F.Supp. 929, 937–38 (D.D.C.1973). *See also* K. Davis, *supra* note 43, at 163–64.

sions of personal privacy", 5 U.S.C. § 552(b)(6) (1970) (emphasis added), and requires a balancing of the interests in disclosure and in privacy.[45] Such a balancing approach appears quite suitable for determining whether "personalized" financial information should be exempted from the general disclosure provisions of the Act. Since exemption six may be available to protect any privacy interests of the concession owners in this case, we see no reason to read a privacy concern into exemption four.

This brief discussion suffices to show that the district court's legal conclusion on the privacy issue is impermissibly vague as well as unsupported by any record evidence. We therefore reverse its decision that some of the financial records are protected on grounds of individual privacy and remand the case for a determination whether the sixth exemption might apply to any of the concessioner's financial records specifically found to be "personalized." Such an inquiry may, of course, be unnecessary should the two remaining concessioners adduce proof sufficient under *Pacific Architects, supra,* to satisfy the second prong of the fourth exemption's *National Parks I* test.

■ Finally, we note that confusion still persists whether section 1905 of the federal criminal code, 18 U.S.C. § 1905 (1970), might provide still another basis for justifying non-disclosure of the concessioners' financial records.[46] Section 1905 makes it illegal for an officer or employee of the government to disclose *"to any extent not authorized by law* any information [concerning] the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person

. . . ." *Id.* (emphasis added). Appellees argue in circular fashion that section 1905 excludes the information sought by the Association from required disclosure as matter "specifically exempted from disclosure by statute," under the FOIA's third exemption. 5 U.S.C. § 552(b)(6) (1970). The obvious flaw in this argument is that section 1905 only prohibits a disclosure "not authorized by law." The FOIA not only authorizes, but actually requires, disclosure of all nonexempt matters, so section 1905 cannot be treated as yet another FOIA exemption.[47]

■ For other reasons too, we continue in our view that the third exemption "does not incorporate section 1905 into the FOIA in such a way as to make section 1905 broader than the fourth exemption." *Charles River Park "A", Inc. v. Department of HUD,* 171 U.S.App.D.C. 286, 519 F.2d 935, 941 n.7 (1975). The third exemption requires that matters be *"specifically* exempted from disclosure by statute," 5 U.S.C. § 552(b)(3) (1970) (emphasis added), yet section 1905 by its own terms is a statute of general applicability and not one that specifically defines or categorizes the information to be exempted within the meaning of the third exemption. *See, e. g., Grumman Aircraft Engineering Corp. v. The Renegotiation Board,* 138 U.S.App.D.C. 147, 425 F.2d 578, 580 n.5 (1970); *M. A. Schapiro & Co. v. SEC,* 339 F.Supp. 467, 469–70 (D.D.C.1972). Appellees now suggest, however, that the Supreme Court's recent decision in *FAA v. Robertson,* 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), has "undercut" this reasoning[48] so

---

**45.** *See Ditlow v. Shultz,* 170 U.S.App.D.C. 352, 517 F.2d 166, 170–72 (1975); *Rural Housing Alliance v. Dept. of Agriculture,* 162 U.S.App. D.C. 122, 498 F.2d 73, 77 (1974); *Getman v. NLRB,* 146 U.S.App.D.C. 209, 450 F.2d 670, 674 (1971).

**46.** The district court's commentary on this particular issue is dictum, as is our own. *See* J.A. 297–98.

**47.** *See* K. Davis, Administrative Law of the Seventies § 3A.18, at 88–89 (1976), *citing M. A.*

*Schapiro & Co. v. SEC,* 339 F.Supp. 467 (D.D. C.1972).

**48.** In *Robertson* the Federal Aviation Administration had denied requests for certain information gathered by it on the ground that the documents were protected by section 1104 of the Federal Aviation Act, 49 U.S.C. § 1504 (1970). That section permits the FAA Administrator to withhold any information obtained by the agency, if he determines that disclosure "would adversely affect the interests of [any person objecting to disclosure] and is not required in the interest of the public." *Id.* The

that we should now give effect to the third exemption's "literal language" by finding that financial information covered by section 1905 is "exempt from disclosure where the government has 'not authorized [release] by law,' including regulation or other decision." Government's Brief at 33 n.24. This we refuse to do. Not only has Congress recently overruled the Supreme Court's decision in *Robertson* by amending the third exemption,[49] but we are also satisfied that section 1905 is qualitatively dissimilar to the specific statute dealt with in *Robertson* so that no reevaluation of our prior decisions on this question is warranted.[50]

## IV. CONCLUSION

 Congress enacted the Freedom of Information Act to ensure comprehensive public access to government records, limited only by certain narrowly-construed exemptions enacted to protect other important interests. Exemption four protects against required disclosure of confidential financial information obtained from a person, if the party seeking to prevent disclosure can meet the *National Parks I* test.

In the case before us, members of the public requested the National Park Service to disclose very detailed and extensive financial information submitted by certain park concessioners as required by law. The party seeking disclosure believes that this information will aid its investigation of inadequate and ineffective Park Service policies. The concessioners, on the other hand, resist disclosure on the ground that it would seriously harm their competitive positions. Balancing these opposing interests indeed is not an easy task. See *Environmental Protection Agency v. Mink*, 410 U.S. 73, 80, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973) and S.Rep. No.854, 93d Cong., 2d Sess. 13–15 (1974). Still we believe that the test of confidentiality set forth in *National Parks I* does provide an appropriate means for giving effect to the balance Congress itself sought to establish when it enacted the fourth exemption.

We affirm Judge Gasch's decision that disclosure would be likely to cause substantial harm to the competitive positions of the Cavern Supply Co., General Host Corp., Mountain Co., Yosemite Park & Curry Co. and Fred Harvey, Inc. Their financial information, not otherwise publicly available in the records of another agency, see J.A. 295, is therefore confidential within the meaning of the fourth exemption, and not subject to required disclosure by the Park Service. The district court's decision with respect to National Park Concessions, Inc. and Buzzard Point Boatyard Corp., however, must be reversed since there is no satisfactory evidence in the record to support the court's finding that they face meaningful competition. The court on remand should determine whether these two remaining concessioners meet the *National Parks I* test or, alternatively, whether exemption six prevents required disclosure of

Supreme Court reversed this court's decision, *Robertson v. Butterfield*, 162 U.S.App.D.C. 298, 498 F.2d 1031, 1036 (1974), which held that section 1104's public interest standard is not a "specific exemption by statute" within the meaning of the third exemption. The Supreme Court considered this too narrow a construction and held that section 1104 falls within that exemption. 422 U.S. at 261–67, 95 S.Ct. 2140.

**49.** S.Rep.No.94–1178, 94th Cong., 2d Sess. 14 (1976). U.S.Code Cong. & Admin.News 1976, p. 3665. Section 552(b)(3) has been amended to read:

(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld . . . . .

Pub.L.No.94–409, § 5 (Sept. 13, 1976), *amending* 5 U.S.C. § 552(b)(3) (1970).

**50.** Section 1104 specifically authorizes nondisclosure of information filed with or obtained by a specific agency, the FAA, whereas section 1905 is merely a general prohibition against *unauthorized* disclosures of confidential commercial or financial information. Any other interpretation would require departure from the established policy of construing FOIA exemptions narrowly, *see, e. g., Vaughn v. Rosen, supra*, at 823 n.11, and the general rule that a criminal statute is to be narrowly construed. *Charles River Park A, supra*, at 943.

their financial information on personal privacy grounds.

*Judgment accordingly.*