**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
MUSLIM ADVOCATES,                   )
                                    )
              Plaintiff,            )
                                    ) Civil Action No. 09-1754
       v.                           )
                                    )
UNITED STATES DEPARTMENT            )
OF JUSTICE,                         )
                                    )
              Defendant.            )
_____)


**MEMORANDUM OPINION**

Plaintiff Muslim Advocates brings this action under the

Freedom of Information Act ("FOIA"), seeking the complete and

unredacted final version of certain chapters of the Domestic

Investigations and Operations Guide (the "DIOG") of the Federal

Bureau of Investigation ("FBI"), which were previously shown to

plaintiff and other civil rights and civil liberties groups

during two meetings at FBI headquarters in November 2008 (the

"November 2008 meetings").[1]  Plaintiff principally argues that

the FBI waived its right to withhold those chapters of the DIOG

after it allowed representatives of Muslim Advocates and other

---

[1]    In its complaint, plaintiff initially sought disclosure of
the complete and unredacted final versions of the DIOG.  Compl.
¶ 1.  Plaintiff, however, subsequently limited its request to
"those four chapters of the DIOG that were circulated during the
November [2008] meetings[.]"  Pl.'s Combined Opp'n and Cross-
Mot. at 3.

organizations to review and take notes on the materials during the November 2008 meetings. Defendant, the Department of Justice (the "government" or the "agency"), disputes plaintiff's allegation of waiver, and argues that it properly withheld the material pursuant to FOIA Exemption 7(E), 5 U.S.C. § 552(b)(7)(E), because production of the requested material would result in disclosure of specific internal investigatory techniques and procedures that are used by the FBI and would present a risk that "criminals, terrorists and foreign intelligence operatives would be assisted in or emboldened to violate the law and circumvent the FBI's enforcement efforts."[2] Def.'s Combined Opp'n & Reply at 2-3.

Pending before the Court are the parties' cross-motions for summary judgment. Upon careful consideration of the motions, the responses and replies thereto, the parties' supplemental filings, the applicable law, and the entire record, including the agency's affidavits and the relevant chapters of the DIOG, the Court hereby **GRANTS IN PART AND DENIES IN PART** defendant's

---

[2] In its motion for summary judgment, defendant also argued that it properly withheld the disputed material pursuant to FOIA Exemption (b)(2), 5 U.S.C. § 552(b)(2). Following the Supreme Court's decision in *Milner v. Department of the Navy*, 131 S. Ct. 1259 (2011), however, defendant withdrew that argument. *See* Def.'s Response to Pl.'s Notice, Docket No. 26 ("In light of the Supreme Court's decision in *Milner*, Defendant no longer relies on exemption (b)(2) to support its withholding of 'High 2' information. It continues to rely on FOIA's exemption (b)(7)(E) as justification for the same withholdings[.]").

2

motion for summary judgment and **DENIES** plaintiff's cross-motion for summary judgment.

## I.   Background

### A.   The DIOG

As noted above, plaintiff seeks release of certain chapters of the FBI's Domestic Investigations and Operations Guide.  The DIOG was written to consolidate policy pursuant to the Attorney General's Guidelines for Domestic FBI Operations, which was signed by Attorney General Michael Mukasey on September 29, 2008.  Pl.'s SMF ¶ 1.  In the preamble of the DIOG, FBI Director Robert S. Mueller, III describes the purpose of the DIOG as follows:

> While investigating crime, terrorism, and threats to the national security, and collecting foreign intelligence, the FBI must fully comply with all laws and regulations, including those designed to protect civil liberties and privacy. . . . To assist the FBI in its mission, the Attorney General signed *The Attorney General's Guidelines for Domestic FBI Operations* (AGG-Dom) on September 29, 2008.  The primary purpose of the AGG-Dom and the Domestic Investigations and Operations Guide (DIOG) is to standardize policy so that criminal, national security, and foreign intelligence investigative activities are accomplished in a consistent manner, whenever possible (e.g., same approval, notification, and reporting requirements). . . . The changes implemented by the DIOG should better equip [the FBI] to protect the people of the United States against crime and threat to national security and to collect foreign intelligence.

Docket No. 12-1, DIOG-11.  Implemented in December 2008, the DIOG is a "'comprehensive 270-page collection of procedures,

3

standards, approval levels, and explanations[,]'" that contains information "ranging from general principles to chapters detailing the FBI's procedures for conducting clandestine operations."  Def.'s Mot. at 2 (internal citations omitted).

**B.    The November 2008 Meetings & the December 2008 Implementation of the DIOG**

Prior to implementing the DIOG, however, the FBI held two meetings with civil rights and civil liberties groups in November 2008.[3]  Specifically, by emails dated November 12, 2008 and November 17, 2008, the FBI invited various organizations to attend two separate meetings as part of an outreach program to obtain input on the civil liberty, privacy and civil rights concerns on the DIOG.  Pl.'s SMF ¶ 7.  The invitation received by Muslim Advocates provided as follows:

> The FBI Office of General Counsel (OGC) would like to invite you to participate in a discussion of respectively, civil liberty/privacy and civil rights protections in the FBI's new Domestic Investigative Operational Guidelines (which will implement the new AGG) on Wednesday November 19th at 1:00 pm at FBI headquarters. OGC will provide pertinent sections for you to read. The manual has not been finalized. Your input and suggestions will be well received and appreciated. Please RSVP by November 14, 2008.

Ex. A to the Declaration of Brenda Abdelall ("Abdelall Decl."), Docket No. 16-3.

---

[3]    The Court will note that for purposes of resolving the pending cross-motions, the FBI has agreed to accept Muslim Advocates' version of events at the November 2008 meetings.  *See* Def.'s Combined Opp'n & Reply at 6.

During the November 2008 meetings, a representative of the FBI gave an introductory presentation about the DIOG. Pl.'s SMF ¶ 12. All of the attendees were provided with a copy of the presentation, which they were required to return at the end of the presentation. Pl.'s SMF ¶ 12.

Attendees were also provided with Chapters 4, 5, 10, and 16 of the DIOG (the "disputed chapters"). Pl.'s SMF ¶ 13. These chapters discuss: (i) "Privacy and Civil Liberties, and Least Intrusive Methods" (Chapter 4); (ii) "Assessments" (Chapter 5); (iii) "Sensitive Investigative Matter / Academic Nexis" (Chapter 10); and (iv) "Undisclosed Participation" (Chapter 16). *See* Docket No. 12-1, DIOG-3 – DIOG-9. The version of the disputed chapters disclosed at the November 2008 meetings totaled approximately 100 pages in length and did not contain any redactions. *See* Pl.'s SMF ¶ 15; Abdelall Decl. ¶ 10.[4]

After the introductory presentation concluded, attendees were given time to review and take notes on the disputed chapters. Pl.'s SMF ¶ 16. FBI Deputy General Counsel Dave Larson remained in the room while the attendees reviewed the materials and "told them that they could take their time

---

[4] Although the chapters provided to the attendees were in draft form, *see* Pl.'s SMF ¶ 13, the government has stipulated for purposes of summary judgment "that the chapters of the DIOG reviewed at these meetings were substantially the same as the chapters in the final DIOG." Def.'s Combined Opp'n & Reply at 2.

reviewing the documents." Pl.'s SMF ¶ 19. Mr. Larson also "welcomed participant commentary and took notes on the commentary." Pl.'s SMF ¶ 19.

At the conclusion of the meetings, which lasted approximately two hours, attendees were required to return the disputed chapters and were thanked for their help and feedback. *See* Pl.'s SMF ¶ 20; Abdelall Decl. ¶¶ 20-21. Attendees were permitted, however, to take their notes on the DIOG with them and were never asked to return them. Pl.'s SMF ¶ 17. In addition, attendees were not told that the material reviewed at the meeting was confidential or that they could not share the information with their respective groups, communities, or the general public; nor were participants required to sign any documents affirming that they would keep this information confidential. Pl.'s SMF ¶ 18; *see also* Pl.'s SMF ¶ 8.

The day after the second meeting, on November 26, 2008, Muslim Advocates and several other organizations that had attended the November 2008 meetings wrote a letter to Director Mueller "reiterating their concerns over the civil liberties and civil rights implications of the DIOG, as well as expressing concerns with the lack of meaningful review of the DIOG and again calling for the public release." Pl.'s SMF ¶ 21; *see also* Ex. H to Declaration of Farhana Khera ("Khera Decl."), Docket No. 16-15 (requesting an opportunity for "meaningful review" of

6

the DIOG in advance of its scheduled implementation; explaining that "no copies [of the DIOG] have been released to date, ad [sic] participants in the briefings were not allowed to examine the 100-page document except during the live sessions, neither of which afforded sufficient time for a rigorous examination"). Despite plaintiff's request that implementation of the DIOG be delayed, *see* Ex. H to Khera Decl., Docket No. 16-15, the DIOG was implemented on December 16, 2008, *see* Pl.'s SMF ¶ 23.

## C.   Plaintiff's FOIA Request & Initiation of this Action

Soon thereafter, on January 28, 2009, plaintiff sent a FOIA request to the DOJ Office of Information and Privacy and the FBI FOIA Requester Service Center. Pl.'s SMF ¶ 25. The FBI responded to plaintiff's FOIA request on March 18, 2009, informing plaintiff that portions of the DIOG would be released to the public on the FBI's public website, and that it was therefore closing plaintiff's FOIA request. Pl.'s SMF ¶ 27. On May 15, 2009, after nearly two months of waiting for the public release of the DIOG, plaintiff appealed the decision to close its FOIA request to the Office of Information and Privacy. Pl.'s SMF ¶ 30. The office acknowledged receipt of the appeal on May 27, 2009, but did not release the DIOG. Pl.'s SMF ¶ 31. Plaintiff then filed suit in this Court on September 16, 2009 seeking disclosure of the DIOG. *See* Compl. ¶ 1.

Following plaintiff's initiation of this action, the FBI posted a redacted version of the DIOG on its website on September 25, 2009.  *See* Pl.'s SMF ¶ 46.  In response to this limited release, plaintiff filed an amended complaint, in which it renewed its request for a "complete and unredacted final version" of the DIOG, arguing that the redacted material was "wrongfully withheld."  Am. Compl. ¶¶ 34, 35; *see also* Am. Compl. ¶ 2 ("On September 25, 2009, the Department posted a significantly redacted version of the DIOGs to the FBI website, withholding nearly entire sections on a number of topics— including sections that address the infiltration of Muslim community and religious organizations.  These redactions are particularly unjustifiable because unredacted versions of these key sections were discussed and/or included in the version shown to Plaintiff during the November 2008 meetings.").

The agency subsequently filed a motion for summary judgment. Although defendant initially sought summary judgment as to all of the information withheld in the DIOG, the scope of this litigation was significantly narrowed by plaintiff's decision to limit its arguments to "those four chapters of the DIOG that were circulated during the November [2008] meetings - Chapters 4, 5, 10, and 16[.]"  Pl.'s Combined Opp'n and Cross-Mot. at 3.  The scope of this litigation was further narrowed after the agency then determined that Chapter 4 of the DIOG

could be released "without harm" and produced that chapter in its entirety. *See* Def.'s Combined Opp'n & Reply at 3. Pending before the Court, therefore, are cross-motions for summary judgment regarding the FBI's decision to withhold certain information contained in Chapters 5, 10, and 16 of the DIOG. Those motions are now ripe for determination by the Court.

## II. Legal Framework

### A. Rule 56

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 658 F. Supp. 2d 217, 224

9

(D.D.C. 2009) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975)).

## B. FOIA

FOIA requires agencies to disclose all requested agency records, 5 U.S.C. § 552(a), unless one of nine specific statutory exemptions applies, *id.* § 552(b). "It is designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Consumers' Checkbook, Ctr. for the Study of Servs. v. United States HHS*, 554 F.3d 1046, 1057 (D.C. Cir. 2009) (internal quotation marks omitted). "Consistent with 'the basic policy that disclosure, not secrecy, is the dominant objective of the Act,' the statutory exemptions are 'narrowly construed.'" *Id.* (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)); *see also Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) ("Given the FOIA's broad disclosure policy, the United States Supreme Court has 'consistently stated that FOIA exemptions are to be narrowly construed.'" (quoting *Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988))).

"FOIA's 'strong presumption in favor of disclosure places the burden on the agency' to justify nondisclosure." *Consumers' Checkbook*, 554 F.3d at 1057 (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). The government may satisfy its burden of establishing its right to withhold information from the public by submitting appropriate declarations and, where necessary, an

10

index of the information withheld. *See Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU v. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011). Moreover, "'an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.''" *ACLU*, 628 F.3d at 619 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

## III. Discussion

### A. Waiver

The threshold issue before the Court is whether the FBI waived its right to invoke Exemption 7(E)[5] and withhold the redacted material in the disputed chapters of the DIOG after it allowed members of various civil rights and civil liberties

---

[5] Exemption 7(E) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

groups to review unredacted versions of the chapters during the November 2008 meetings. Plaintiff argues that waiver has occurred, explaining that because the FBI "already disclosed chapters 4, 5, 10, and 16 to members of the general public . . . [it] can no longer rely on any exemption to continue withholding the requested information." Pl.'s Combined Opp'n & Cross-Mot. at 17. Defendant, by contrast, contends that "because the contested provisions of the DIOG have not been made part of a permanent public record, the FBI has not waived any FOIA exemptions." Def.'s Combined Opp'n & Reply at 6. For the reasons discussed below, the Court agrees with defendant and finds that no waiver occurred.

In this Circuit, the "public-domain doctrine" has emerged as the dominant paradigm for evaluating the waiver of a potential FOIA exemption. "Under [the] public-domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999) (citing *Niagara Mohawk Power Corp. v. United States Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999) (Exemption 4); *Public Citizen v. Dep't of State*, 11 F.3d 198, 201-03 (D.C. Cir. 1993) (Exemption 1); *Davis v. United States Dep't of Justice*, 968 F.2d 1276, 1276 (D.C. Cir. 1992) (Exemptions 3 & 7(C)); *Afshar v. Dep't of State*, 702 F.2d 1125,

12

1130-34 (D.C. Cir. 1983) (Exemptions 1 & 3)). The logic of this doctrine is that "where information requested 'is truly public, then enforcement of an exemption cannot fulfill its purposes.'" *Id*. (quoting *Niagara Mohawk*, 169 F.3d at 19). "[A] plaintiff asserting that information has been previously disclosed bears the initial burden of pointing to specific information in the public domain that duplicates that being withheld." *Public Citizen*, 11 F.3d at 201.

Plaintiff principally argues that the disputed chapters of the DIOG are in the public domain because the FBI allowed individuals outside of the agency to review the material. *See* Pl.'s Combined Opp'n & Cross-Mot. at 18 ("By handing out [the disputed chapters] to persons outside the agency, the FBI knowingly released the information to the public[.]" (citing *Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 254-55 (D.D.C. 2005)[6]); Pl.'s Reply at 6 ("When the FBI

---

[6] The Court finds plaintiff's reliance on *Leadership Conference on Civil Rights* misplaced as that case does not address the issue of waiver or the public-domain doctrine. Instead, it deals with whether the government properly withheld certain documents pursuant to Exemption 5 of FOIA, which protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). That court found that Exemption 5 was inapplicable, explaining that "[b]ecause the 2004 training manual was made available to individuals not associated with the executive branch, it cannot be 'inter-agency or intra-agency' communication, and thus does not satisfy the requirements for application of the deliberative process privilege of Exemption 5." *Leadership Conf. on Civil*

allowed members of the general public to read and take notes on the four chapters of the DIOG, it released the information in those chapters to the public and lost control over the distribution of that information. Members of the general public now control that information, which puts it in the public domain."). The Court finds this argument unpersuasive.

Although the FBI allowed Muslim Advocates and several other civil rights and civil liberties groups to view the disputed chapters during a two-hour meeting at FBI headquarters, the Court is not convinced that such a limited review is sufficient to satisfy the requirements of the public-domain doctrine in the absence of evidence that the disputed chapters are now "truly public." *Cottone*, 193 F.3d at 555. Indeed, the Circuit has counseled that "[f]or the public domain doctrine to apply, the specific information sought must have already been 'disclosed and preserved in a permanent public record.'" *See Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001).

On this point, the Court finds the D.C. Circuit's decision in *Students Against Genocide* particularly instructive. That case involved classified "spy satellite" and "spy plane"

---

*Rights*, 404 F. Supp. 2d at 255. Because *Leadership Conference on Civil Rights* dealt with whether an agency properly asserted a particular FOIA exemption, *id.* at 254 – *not* whether the agency had waived its right to assert the particular FOIA exemption – the Court finds it inapposite to the facts of this case.

14

photographs that then-U.S. Ambassador Madeleine Albright showed to members of the United Nations Security Council. 257 F.3d at 830. The plaintiff organizations in that case argued that Ambassador Albright waived the government's right to invoke the pertinent FOIA exemptions (Exemptions 1 and 3) by displaying the withheld photographs to the delegates of the foreign governments that were members of the Security Council. *Id.* at 836. The Circuit rejected plaintiff's argument, explaining that:

> The photographs in question here plainly do not fall within the [public domain] doctrine. They were not released to the general public; only the Security Council delegates saw them. In fact, the photographs were not "released" at all. Although Ambassador Albright displayed them to the delegates, she retained custody, and none left the U.N. chamber. Hence, there is no "permanent public record" of the photographs.

*Id.* at 836 (internal citations omitted) (citing *Cottone*, 193 F.3d at 554). After also rejecting the plaintiff organizations' "slight variation[s]" on the public-domain doctrine theme, the Circuit concluded that the government had not waived its right to withhold the classified photographs from release under FOIA by displaying them to the Security Council. *Id.* at 836, 837.

Similarly, in this case, the disputed chapters were not released to the general public; rather, they were only shown to a select group of organizations – personally invited by the FBI – at FBI headquarters. Although the attendees were permitted to view and take notes on the disputed chapters for approximately

15

two hours, they were required to return the documents at the end of the meeting. As none of the disputed chapters left FBI headquarters, the Court finds that there is no "permanent public record" of the disputed chapters in the public domain.

Plaintiff attempts to circumvent the public-record requirement by arguing that "[t]he free and full note taking allowed during the meeting . . . provided the meeting participants with ample means to make the distributed material part of the permanent public record, therefore satisfying this standard." Pl.'s Combined Opp'n & Cross-Mot. at 19 n.5; *see also* Pl.'s Reply at 9 (arguing that the retention of notes created a permanent public record). The Court finds this argument unpersuasive. Even assuming that plaintiff had "ample means" to make a permanent record of the approximately 100 pages of the DIOG that was distributed during the two-hour meeting, plaintiff has produced no evidence that the redacted sections of the disputed chapters are, in fact, in the public domain.

While the D.C. Circuit has not established "a uniform, inflexible rule requiring every public-domain claim to be substantiated with a hard copy simulacrum of the sought-after material[,]" it has recognized that "it will very often be the case that some type of hard copy facsimile will be the only practicable way for a FOIA requester to demonstrate that the specific information he has solicited has indeed circulated into

16

the public domain." *Cottone*, 193 F.3d at 555. No such evidence has been provided in this case. Without such documentation, the Court lacks confidence that the redacted portions of the disputed chapters are "truly public." *See id.* (explaining that "while the 'logic of FOIA' postulates that an exemption can serve no purpose once information – including sensitive law-enforcement intelligence – becomes public, [courts] must be confident that the information sought is truly public and that the requester receive no more than what is publicly available before we find a waiver" (internal citation omitted)).

The Court will note that its lack of confidence stems, in part, from plaintiff's repeated complaints regarding its inability to conduct a "meaningful review" of the DIOG. Pl.'s SMF ¶ 21. Indeed, the letter that Muslim Advocates sent to FBI Director Mueller immediately following the November 2008 meetings argued that a "meaningful review" of the DIOG was necessary, explaining that "no copies have been released to date, ad [sic] participants in the briefings were not allowed to examine the 100-page document except during the live sessions, neither of which afforded sufficient time for a rigorous examination." Ex. H to Khera Decl., Docket No. 16-15. Plaintiff reiterated those concerns in its FOIA request, in which it complained that participants in the November 2008 meetings "were allowed only limited time to examine the 100-page

17

document, which was insufficient for a meaningful review." Def.'s Ex. 2, Docket No. 12-8. As the participants in the November meetings lacked sufficient time for a "rigorous examination" or "meaningful review" of the disputed chapters, the Court is not persuaded – absent some evidence to the contrary – that the note-taking participants assembled a permanent public record that "duplicates that being withheld." *Public Citizen*, 11 F.3d at 201.[7]

---

[7] If there was a permanent public record of the disputed chapters then plaintiff would not have had to file a FOIA request in order to conduct a meaningful review of the material. *See Assassination Archives and Research Ctr. v. Central Intelligence Agency*, 334 F.3d 55, 60 n.6 (D.C. Cir. 2003) ("[A]s a practical matter waiver under [the public-domain doctrine] yields the FOIA plaintiff little new information. Indeed, if a plaintiff can establish that the specific records he seeks have become 'freely available, there would be no reason to invoke the FOIA to obtain access to the information.'" (quoting and discussing *Davis v. Dep't of Justice*, 968 F.2d 1276, 1279-80 (D.C. Cir. 1992)) (internal citations omitted)). Although plaintiff contends that this "broad view of the public domain doctrine renders FOIA meaningless[,]" Pl.'s Reply at 10, the Court disagrees. As noted above, the public-domain doctrine is premised upon the logic that a FOIA exemption can no longer serve its purpose when there is a permanent public record of the requested information. *See Cottone*, 193 F.3d at 554. The Court is not persuaded, however, that the application of the public-domain doctrine in this case – a case where a FOIA exemption can still serve its purpose because the information requested is *not* truly public - renders FOIA meaningless. *See Students Against Genocide*, 257 F.3d at 836 ("This circuit has held that the government may not rely on an otherwise valid exemption to justify withholding information that is already in the 'public domain.' We have noted, however, that while the logic of FOIA postulates that an exemption can serve no purpose once information . . . becomes public, we must be confident that the information sought is truly public and that the requester

18

The Court, therefore, finds that plaintiff has failed to meet its "initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Afshar*, 702 F.2d at 1130; *see also, e.g.*, *Davis*, 968 F.2d at 1280 ("[T]o obtain portions of tapes alleged to be in the public domain, [the FOIA applicant] has the burden of showing that there is a permanent public record of the exact portions he wishes. It does not suffice to show - as he has done - that *some* of the tapes were played to shift the burden to the government. [The FOIA applicant] has not satisfied his burden to point to specific information in the public domain.").[8] Accordingly, plaintiff's motion for summary judgment is **DENIED**.

---

receive no more than what is publicly available before we find a waiver." (internal citations and quotation marks omitted)); *cf. Prison Legal News v. Exec. Office for United States Attys.*, 628 F.3d 1243, 1253 (10th Cir. 2011) ("The public domain doctrine is limited and applies only when the applicable exemption can no longer serve its purpose. Given that the public domain doctrine nowhere appears in the statutory text of FOIA, only the failure of an express exemption to provide any protection of the interests involved could justify its application.").

[8]     Plaintiff also argues that "this Court should apply a less deferential waiver standard for material withheld under Exemption 7(E), and not the national security standard developed under Exemption 1." Pl.'s Combined Opp'n and Cross-Mot. at 23. The Court finds this argument unpersuasive for several reasons. First, the D.C. Circuit has never limited application of the public-domain doctrine to cases involving national security, but, instead, has applied it in several non-national security contexts. *See, e.g.*, *Cottone*, 193 F.3d at 554 (citing cases that apply the public-domain doctrine in the context of FOIA Exemptions 1, 3, 4, and 7(C)). The Court will nevertheless

19

## B.   Exemption 7(E)

Having found that no waiver occurred, the Court must now determine whether the agency properly withheld material from 52

---

note, however, that "the FBI's rationale for withholding portions of the DIOG is directly intertwined with concerns regarding national security. . . . In considering the risks of widespread disclosure of certain DIOG provisions, the FBI explicitly found that concerns about national security and counterintelligence issues counseled withholding."  Def.'s Combined Opp'n & Reply at 13 (internal citations omitted). Therefore given both the "circumstances of prior disclosure" – in which a small group of civil rights and civil liberties groups were invited to FBI headquarters and given approximately two hours to review and give feedback to the FBI on the civil liberty, privacy, and civil rights concerns of the FBI's domestic investigation guidelines – and "the particular exemption[] claimed" – i.e., Exemption 7(E)'s protection of information compiled for law enforcement purposes, the Court finds that application of the public-domain doctrine is appropriate in this case. *Carson v. U.S. Dep't of Justice*, 631 F.2d 1008, 1015 n.30 (D.C. Cir. 1980).

The Court will also note its disagreement with plaintiff's contention that this Court "should follow the strong presumption of disclosure under FOIA in fashioning a test for waiver under 7(E) that results in a narrow exemption from disclosure."  Pl.'s Reply at 4 (citing *Wolf*, 473 F.3d at 374).  In *Wolf*, the D.C. Circuit stated as follows:  "The FOIA mandates broad disclosure of government records to the public, subject to nine enumerated exemptions.  Given the FOIA's broad disclosure policy, the United States Supreme Court has 'consistently stated that FOIA exemptions are to be narrowly construed.'"  473 F.3d at 374 (internal citations omitted).  Despite plaintiff's arguments to the contrary, the Court is not persuaded that FOIA's broad presumption in favor of disclosure is applicable in the waiver context.  Indeed, the Court finds its obligation to narrowly construe FOIA exemptions in favor of requiring an agency to disclose information that is being improperly withheld, fundamentally different than creating a less stringent waiver standard whereby an agency loses the right to assert an otherwise applicable FOIA exemption (and is thereby required to disclose information that is not truly public).

20

pages of the DIOG pursuant to Exemption 7(E).  As noted above, Exemption 7(E) protects records or information compiled for law enforcement purposes from disclosure "to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  Courts have held that information pertaining to law enforcement techniques and procedures is properly withheld where disclosure reasonably could lead to circumvention of laws or regulations.  *See, e.g.*, *Skinner v. Dep't of Justice*, 744 F. Supp. 2d 185, 214 (D.D.C. 2011) (citing cases).  "[A] highly specific burden of showing how the law will be circumvented" is not required; instead, "exemption 7(E) only requires that [the agency] 'demonstrate[] logically how the release of [the requested] information might create a risk of circumvention of the law.'"  *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1994 (D.C. Cir. 2009) (quoting *PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993)).

Defendant asserts Exemption 7(E) in order to "protect information consisting of special internal investigatory techniques and procedures that are used by the FBI . . . [that] if release[d] could reasonably be expected to give anyone with

21

that particular knowledge the ability to circumvent the law."

Declaration of John S. Pistole, Docket No. 13-5 ("Pistole

Decl.") ¶ 30.  Defendant explains that "revelation of [the

redacted material] could enable the targets of these techniques

to avoid detection or develop countermeasures to circumvent the

ability of the FBI to effectively use this important national

security law enforcement technique."  Pistole Decl. ¶ 30.[9]

With respect to the 52 pages of redactions at issue in this

case, defendant has submitted an affidavit that specifically

identifies ten categories of information involving the FBI's

techniques and procedures, which it avers, "would cause harm to

FBI's criminal and national security investigations" if

released.  *See* Def.'s Combined Opp'n & Reply at 5; Pistole Decl.

¶ 7.  Those categories are: (i) information identifying the

contents of particular file numbers, forms, and databases;

(ii) information about the FBI's operational directives;

---

[9]     Defendant also avers that "[t]he FBI's rationales for withholding this information must be understood in the larger context of the current security and criminal prosecution climate.  In addition to combating the criminal acts of sophisticated illicit enterprises (such as organized crime syndicates and drug cartels), the FBI is also charged with protecting the nation from security risks posed by individuals, organizations (such as terrorist groups), and foreign nations that seek to harm the United States.  The FBI's public disclosure of information is carefully scrutinized by the enemies of the United States.  Intelligence services and terrorists use open-source information to gather intelligence about United State's capabilities and methods. . . ."  Pistole Decl. ¶ 8.

22

(iii) specific scenarios in which specific techniques are authorized; (iv) approval limitations on techniques or procedures that may be used in certain types of investigations; (v) identification of obscure capacities and investigative techniques; (vi) the scope of sensitive investigative matters; (vii) information on the duration for which particular actions are authorized; (viii) details about undisclosed participation; (ix) information concerning the FBI's collection and/or analysis of information; and (x) certain terms and definitions. *See* Def.'s Combined Opp'n & Reply at 5; *see also* Pistole Decl. ¶ 7. In its affidavit, defendant provides descriptions of each of these categories and discusses how release of the information within that particular category could create a risk of circumvention of the law. *See generally* Pistole Decl.; *see also* Def.'s Mot. 6-22.

In its opposition brief, Muslim Advocates does not challenge the applicability of Exemption 7(E) nor does it challenge the rationale for any of the categories of redactions. *See generally* Pl.'s Combined Opp'n & Cross-Mot. at 27-34. Instead, plaintiff more generally responds by reprising its waiver argument, asserting that "the same facts supporting a finding of waiver at the very least call into question whether the information the FBI seeks to protect is sufficiently 'unknown to the public' to qualify for Exemption 7(E)." Pl.'s

23

Combined Opp'n & Cross-Mot. at 27; *see also* Pl.'s Reply at 12 ("The Department's own actions in holding the meetings without confidentiality restrictions refute its current claim that disclosure of the materials risks circumvention of the law."). Plaintiff then points to "numerous press reports about the FBI's infiltration of mosques and use of undercover agents or confidential informants to gather information from members of ethnic or religious communities," and argues that those materials create "a material issue of fact regarding whether the material claimed exempt is generally known to the public such that the FBI should not be granted summary judgment." Pl.'s Combined Opp'n & Cross-Mot. at 29-30.[10]

The Court finds these arguments unpersuasive. With respect to plaintiff's waiver argument, the Court agrees with defendant that "[t]here is a difference between showing the contested DIOG provisions to a limited audience of a handful of representatives of particular public interest groups and generally disclosing the actual document itself to the public at large." Def.'s

---

[10] Plaintiff also argues that "[t]he FBI is not entitled to summary judgment for the additional and independent reason that it errs in baldly attempting to deny the significant public interest in the DIOG – a public interest that it has repeatedly recognized." Pl.'s Opp'n & Cross-Mot. at 31. While the Court is sensitive to plaintiff's frustration regarding its inability to obtain an unredacted copy of the DIOG, the Court is not persuaded that that the FBI's purported minimization of "the strong public interest in releasing the DIOG to the public" is an independent ground upon which to deny summary judgment. Pl.'s Opp'n & Cross-Mot. at 31.

Combined Opp'n & Reply at 17. Because "[d]isclosing the DIOG in the way Muslim Advocates now demands would increase the risk that criminal elements would either be emboldened to commit crimes or structure their activities to evade detection[,]" Def.'s Combined Opp'n & Reply at 18, the Court finds that the FBI's limited disclosure at the November 2008 meetings does not preclude the agency's claim of Exemption 7(E) as to the redacted material.[11] Nor is the Court convinced that plaintiff's news articles create a genuine issue of material fact regarding whether the FBI's techniques and procedures are sufficiently unknown to the public. Although some information regarding the FBI's use of the particular techniques and procedures discussed in the disputed chapters may be known, "[t]here is no principle . . . that requires an agency to release all details concerning [its] techniques simply because some aspects of them are known to the public[.]" *Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 23 (D.D.C. 2009) (rejecting the plaintiff's argument that information regarding particular procedures witnessed by

---

[11]   *See also* Def.'s Combined Opp'n & Reply at 18 ("More widely distributing the DIOG would allow an opportunity for close analysis of the document's provisions that was not provided at the meetings at issue in this matter. . . . [I]mmediately after the meetings at issue, Muslim Advocates complained that the meetings did not, in fact, allow for careful analysis of the DIOG. Making a full public release of the DIOG would allow just such a detailed review and would not be limited to entities familiar to the FBI.").

the plaintiff and others could no longer be withheld); *see also, e.g., Blanton v. Dep't of Justice*, 63 F. Supp. 2d 35, 49-50 (D.D.C. 1999) (finding that public information regarding the FBI's use of polygraph tests, including "[b]ooks that claim to reveal its techniques and ways to beat the test," did not require disclosure of the information withheld by the FBI; explaining that this public information, "although widely available," did not "indicate the specific methods employed by the FBI" (internal quotation marks omitted)). Because "the public does not have specific knowledge of the circumstances in which undisclosed participation is or is not allowed in FBI investigations or what undisclosed participants are or are not allowed to do," Def.'s Combined Opp'n & Reply at 19, the Court is not persuaded that plaintiff's news articles require the FBI to release the redacted portions of the DIOG.

Therefore, having carefully considered the parties' arguments, the agency's affidavits, as well as the redacted materials, the Court hereby **GRANTS IN PART AND DENIES IN PART** the government's motion for summary judgment. The Court first finds that the government is entitled to summary judgment as to the material it withheld in Chapters 5 and 10 of the DIOG. Specifically, the Court concludes, based upon the limited amount of information withheld from those chapters, that the agency's affidavits, in conjunction with a review of the released

26

material and the agency's index, provides the Court with enough context to conclude that the FBI fairly and accurately described the withheld material and the potential danger created by its release. The Court is not so persuaded, however, with respect to Chapter 16. That chapter is entirely redacted with the exception of the opening paragraph and Section 16.1.A. *See* Docket No. 12-4, DIOG 253 - DIOG 266. Although the agency's affidavit establishes the general applicability of Exemption 7(E) to the withheld material, *see* Pistole Decl. ¶¶ 25, 45, the Court finds that the affidavit is not sufficiently detailed to allow this Court to undertake a meaningful assessment of the redacted material. Therefore, in light of plaintiff's objections regarding the "nearly wholesale redaction" of Chapter 16, *see* Pl.'s Reply at 12, as well as the extremely unusual facts of this case, the Court finds it appropriate to require the government to submit a more specific affidavit providing additional details in support of its extensive redactions in this chapter. Accordingly, the Court hereby **DENIES** defendant's motion for summary judgment as to Chapter 16 without prejudice pending receipt of this additional affidavit. If necessary, the government may submit the declaration *ex parte*. *See, e.g.,* Pistole Decl. ¶ 31 (explaining that its affidavit contains "as much information as the FBI can provide about the redacted material without potentially increasing the risk that FBI

27

techniques or procedures will be circumvented or potential lawbreakers will be encouraged to engage in illegal activities").[12]  This supplemental affidavit shall be filed by no later than November 30, 2011.

## IV.  CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** defendant's motion for summary judgment and **DENIES** plaintiff's cross-motion for summary judgment.  A separate Order accompanies this Memorandum Opinion.

**SIGNED:**　　　　**Emmet G. Sullivan**
　　　　　　　　**United States District Court Judge**
　　　　　　　　**November 10, 2011**

---

[12]  Because the Court finds that the FBI has generally established that the material redacted from the disputed chapters could reasonably be expected to potentially increase the risk of circumvention of the law, the Court declines to reach defendant's alternative argument that the redacted portions of the DIOG are "categorically exempt" from disclosure under Exemption 7(E).